CARL W. VOLNEY

*v.*

LEWIS NIXON.

[Filed May 31st, 1904.]

1. The complainant owned certain patents and most of the stock of a corporation. The defendant, having agreed to furnish capital to enable the corporation to manufacture powder, did so, and took, in his own name, certain machinery and leasehold interests in land. Later, the parties severally transferred the patents, machinery and lands to a new company.—*Held*, that the parties were not partners.

2. The facts proven do not establish that the complainant was led to transfer his patents by false representations made by the defendant.

On bill for relief.

*Mr. Frank P. McDermott* and *Mr. Lindley M. Garrison,* for the complainant.

*Mr. Foster M. Voorhees,* for the defendant.

BERGEN, V. C.

In the year 1896 the complainant organized a corporation, under the laws of the State of New Jersey, known as the "Volney Smokeless Powder Company," with an authorized capital of $100,000, of which he claimed to own ninety per cent. The property of this company consisted of seven small buildings, at Keyport, in this state, costing about $1,600, built on leasehold property, and certain letters-patent covering an invention of the complainant for the manufacture of smokeless powder, he claiming to be an expert in the production of explosives. The evidence shows that he had considerable technical knowledge of the subject, but apparently lacked the power of successful production, as it does not appear in the case that he ever produced a pound of powder for the market, although the patent under which he was experimenting or operating had been issued to him in 1887. Whether the patented formula owned by the company had any merit, it is not necessary to consider here, because previous to the happening of the events out of which this controversy grew the complainant had abandoned all efforts to bring it to the notice of purchasers of explosives, and was then engaged in a mining enterprise in Canada.

Early in the year of 1897 a New York broker, by the name of Wood, one of the incorporators of the Volney company, brought the company and its prospects to the attention of the defendant, and succeeded in interesting him to the extent of agreeing to meet the complainant, who was summoned by Mr. Wood to come to New York City for that purpose.

The complainant and defendant met in New York City, where the matter was laid before the defendant so successfully that he agreed to advance the means required to develop the value of the complainant's patent, the conclusions reached being embodied in a written agreement prepared by the complainant and duly executed by both parties. This agreement bears date May 7th, 1897, and, after reciting that the complainant was the owner of sixty per cent. of the capital stock of the Volney company, stipulated that if the defendant could secure a contract for two hundred thousand pounds of smokeless powder,

conditioned upon a successful trial of a sample lot made under the Volney patents, then the defendant should furnish $5,000 for the purpose of manufacturing such sample lot, and in consideration of the investment of such sum the complainant should transfer to the defendant, at par, stock of the Volney company to the amount of $12,500. In order to supply the money necessary to erect a plant for the manufacture of powder, it was also agreed that $45,000 of the stock of the company would be sold to the defendant at par, and that the complainant would assign to a new company, to be organized with a capital of $1,000,000, all his title and interests in the patents to be obtained in 1897, applications therefor having been filed, the stock of the Volney company to be taken by the new company, on payment of ten shares of new stock for one of the Volney company. Without waiting to secure the contract mentioned in the agreement between them, the defendant, in September, 1897, began advancing money, and after he had paid out all, or nearly all, of the $5,000, and on the 18th day of April, 1898, the stock of the Volney company was issued to him to the extent of $12,500.

The defendant continued to advance money, some of which, amounting to about $13,000, passed through the hands of the complainant, and the residue of a total of $25,000 was paid out directly by the defendant for machinery, materials and wages. About May 10th, 1898, the defendant, through his personal influence, obtained from the United States government an order for one hundred thousand pounds of powder, to be manufactured according to a formula furnished by the United States ordnance department, which was not the formula described in the Volney patents. No powder was furnished under this order, the plant of the Volney company not being sufficient to produce it in the time required, and the order was subsequently canceled.

During the latter part of the year 1897 the complainant had issued to him two letters-patent for inventions for the manufacture of smokeless powder, which were never assigned to the Volney company; on the other hand, all the machinery purchased was bought with the money in the name and remained the property of the defendant.

A lease of forty-four acres of land at South Amboy, with an option to purchase, was taken in the name of the defendant; on it, one or two small buildings, adapted to the manufacture of powder, were erected. The leasehold of the property at Keyport was probably in the name of the complainant, the evidence being somewhat conflicting on this point, but it does appear that at one time the defendant paid $500 for arrears of rent due on this lease. Whatever may have been the reason, it does appear that in February the complainant, having charge of the mechanical part of the company's affairs, had not produced any marketable powder; that the defendant had paid out about $25,000, to represent which he had the stock of the Volney company, of no substantial value, and the title to certain powder-making machinery and material at Keyport, a lease of a tract of land with an option to purchase, located at South Amboy, and some machinery in transit, and that the company had ceased any serious attempts to carry on business when the defendant met, at Atlantic City, a promoter by the name of Gibbs, who was then about to organize a powder manufacturing company, and the defendant proposed to sell him the business he had been trying to build up and also the patents of the complainant. Negotiations ensued, the result of which were the transfer by the complainant of his patents and by the defendant of his machinery, material and leasehold interests to the Gibbs company, incorporated under the name of the "International Smokeless Powder and Dynamite Company." It is over this transfer that the present controversy has arisen. The complainant alleges that the original contract was abandoned; that in all the business between the signing of the original contract and the date of the transfer the complainant and defendant were partners; that he was grossly deceived by the defendant as to the consideration received for the transfer of the partnership property, and that the defendant should account to the complainant for all the stock received by him from the International company.

The complainant does not testify to any agreement of partnership, but insists that it should be inferred from the conduct

of the defendant and gathered from the correspondence between them, and particularly from statements found in numerous letters written by the defendant, such as "we shall both make money," and others of like character, but all such expressions are properly descriptive of their joint interest in the Volney company, as defined by the original contract, and while there is a looseness of expression in these letters and a lack of strict business methods in the conduct of the parties, I am entirely satisfied that there was no express or implied contract of partnership between these parties; that all that was done by either had in view only the success of the Volney company, and that the business, if it prospered, was to benefit the parties in proportion to their holdings in the Volney company, as provided for in their contract, and that the only claim the complainant could establish to the profits of the enterprise would be through the stock he held in that company. This is in accord with their written contract, and no other business agreement having relation to this enterprise has been proven. Every sentence written by the defendant, as to their joint interests, may be consistently referred to their respective rights in the Volney company; the fact that in the end both parties treated the property and patents as individual holdings and sold and transferred them by separate acts and not as joint assets, so far from tending to establish a contract of partnership, goes to prove an amicable distribution between them of what would have been the property of the Volney company or of its proposed successor. They were the owners of the stock of the Volney company, and each disposed of what he had agreed to contribute—the complainant, his patents; the defendant, what remained of the property his money had paid for. There was no partnership and the trust relation arising between partners did not exist.

These parties were stockholders in a corporation whose interests they were jointly endeavoring to advance, hoping for a profitable return through its success. It is nowhere shown that there was any agreement to share the profits or losses, excepting through the instrumentality of the Volney company or of a company into which it might be merged.

In support of his claim, the complainant testified that the defendant, at different times previous to April 5th, 1899, told him that he was trying to interest other parties in the formation of a new company (the company mentioned in the first agreement), with a capital of $1,000,000; that he was not having much success, and feared that they would get but little out of it; that he would have to give away most of his stock to accomplish his purpose, and that he (the complainant) offered to give the defendant one-half of the proceeds, or, as he says, he "conceded to the defendant one-half;" that the negotiations culminated at an interview held at defendant's office, April 5th, 1899, when the defendant stated to the complainant that the Marsden company had gone into the formation of the International Smokeless Powder and Dynamite Company, and that if they went into that company they would only get $350,000 of the stock of that company, and no cash; that he objected to this because he had incurred obligations and expended money to the extent of $2,000, and as the concern would get, as he said, "all I had," they ought to clear up the accounts; that the defendant told him he would pay the $2,000 out of his own pocket, and as to the stock, $50,000 of it was to go to Mr. Meigs, who had aided in the sale, and the $300,000 remaining was to be equally divided between them. He also testified that he was led to believe the capital of the International company was to be $1,000,000, and not $10,000,000, as he afterwards discovered; that the defendant also said that Mr. Gibbs, representing the new company, would not negotiate any further with him unless he (the defendant) was enabled to act, by transfers from the complainant, of his patents and property; that, relying upon these statements, he drew the assignments of his patents to the company the next day, and sent them to the defendant; that he first objected to assign his future inventions in connection with powder-making, but upon the representation of the defendant that he was to be general manager of the new company, with the means of obtaining information regarding the business, the company claimed to be entitled to any improvements he might discover or invent, and would not proceed without it; that he

finally agreed to assign not only present, but all future, patents and inventions of his relating to powder-making, and did make such assignments by two deeds for that purpose—the first, under date of April 8th, of the patents allowed in 1895 and 1897; the second, under date of April 10th, 1899, which covered future inventions. The assignments were followed by a general assignment of the same patents and future inventions by a formal deed, under date of December 18th, 1899, the latter being the only one recorded in the patent office.

Briefly stated, the charge which the complainant makes is that the defendant, by fraudulently misrepresenting to the complainant the true consideration to be received, induced him to part with whatever he transferred to the new company, and that as the defendant was acting as his partner or agent in the premises he was bound, not only to disclose the full consideration, but divide equally whatever he obtained from the company, for all property and rights passing from either, to the new company.

The misrepresentations, if any, which induced the complainant to consent, and upon which he relies for relief, were repeated in full on the 5th day of April, 1899, and it therefore becomes important to determine what statements were made on that day, and whether they were untrue, for fraud must be proven, to the reasonable satisfaction of the court, in order to justify the decree the complainant seeks.

The defendant denies that he perpetrated any fraud, and testifies that early in his negotiations with Gibbs he did offer to accept $350,000, in stock of the new company, and withdraw from all connection with the proposed corporation, and that perhaps he told the complainant of the proposition, but afterwards informed him that it never was accepted; that as a matter of fact the promoters of the new company, wishing the benefit of his name and influence, desired him to take an active interest in the company and serve as its president, promising him, if he would do so, to take care of him, without stating to what extent, and that the company was only willing to give the complainant $100,000 of stock for his patents; that on the 5th

day of April, 1899, he offered the complainant, on behalf of the new company, $100,000 of its stock for his patents; that the complainant was not satisfied with the offer, claiming that he needed $2,000 in cash to clear up certain obligations he had incurred; and further, that he had learned that the capital of the company was to be $10,000,000, instead of $1,000,000, thereby reducing the value of the offer; that thereupon defendant agreed to give complainant $50,000 of whatever stock he might receive, and make an effort to induce the company to pay him $2,000 in money; that, as to the amount of capital of the proposed company, it had been fixed at $10,000,000 by its organizers, and he could not control or change it; that the offer was finally accepted by the complainant, without any reference to what the defendant was to get, and that he shortly after assigned the patents directly to the company; that the stock and cash agreed to be given him was duly issued and paid, $100,000 of the stock going directly from the company to the complainant and $50,000 from the defendant. The defendant further testified that he promised to use his influence to have the complainant employed as the general manager of the new company; that he was successful in such effort, and the complainant was employed as general manager, at a salary of $300 per month, for the first year, and $600 per month thereafter; that after the agreement had been arrived at the complainant insisted that it should be in writing, whereupon the defendant called a stenographer, and in the presence of the complainant dictated a letter containing the terms of the agreement; that this letter was typewritten and mailed to the complainant on the same day. This letter, after reciting that it was written for the purpose of confirming what had been said at the interviews, continues as follows:

"That in the organization of the new powder company the consideration to you for the assignment of all patents which you control will be one hundred thousand dollars ($100,000), par value, of the shares of the International Smokeless Powder Company. In addition to this, it is understood between ourselves that I shall turn over to you fifty thousand dollars ($50,000), par value, of the stock obtained by me from this com-

pany and two thousand dollars ($2,000) in cash. Assignments will be assigned, transferred and set over concurrently with the transfer of the stock."

The foregoing letter, which complainant admits receiving, confirms, in every particular, the statement of the defendant as to what transpired on the day when the complainant says representations were made which were fraudulent and untrue, and which he alleges were totally different from the contents of the letter. The defendant is corroborated in his statements of what occurred, and particularly so as to the dictating of the letter in the presence of the complainant, by two witnesses, who were present during the conversation and while the letter was being dictated, and their testimony shows that the letter correctly states what occurred at the interview.

With reference to the charge that he was deceived as to the capitalization of the new company, he admits that when he received his stock, in April, 1899, he knew the amount of the capital stock of the company; with that knowledge he accepted the stock, and afterwards, in December, 1899, executed a formal transfer of his patents and future inventions to the new company, without protest, and served as its general manager for nearly two years thereafter. The complainant, on reading the statements contained in the letter, knew precisely what he was to get. It was not a consideration for any joint property, but for his patents, and is so absolutely at variance with his statement of what took place that he would certainly have refused to act upon it or accept its benefits if it failed to truly express the agreement. On the contrary, he assigns his patents, accepts not only $100,000 worth of stock and $2,000 in cash, but also the contribution of the defendant, precisely according to the terms of the letter; he enters into the service of the company, serves it in a lucrative position for nearly two years, and only after he has lost that position does he make this claim.

The claim for relief in this cause rests upon questions of fact, and the complainant has not maintained his side of the issue with that fair preponderance of evidence required to justify a finding in his behalf.

It was shown that the defendant received from the company his cash investment and also a large block of stock, but he was a person well known in the financial world, and his connection with the company to be formed might, in the judgment of its promoters, be of sufficient advantage to offer him liberal inducements to remain with them and to act as its president, and the issue of a large quantity of stock to him for redistribution is not, in these days of corporate promoting, unusual nor extraordinary. The contract between the defendant and the company, as shown by its minutes, states that he was to have seventy-nine thousand (79,000) shares of this company, of which twenty thousand (20,000) shares were to be returned to the company for redistribution, and the stock ledger shows that only twenty thousand (20,000) shares were issued to him. Be that as it may, in the view I take of this case, it is of no consequence what he received from the company; the complainant transferred nothing to the company but his patents, and the letter of April 5th shows what he agreed to accept for them, and if it correctly states the agreement, he is estopped from complaining at this late day. The letter corresponds with what the defendant says was the bargain; two witnesses, who were present, sustain his contention and disprove the claim of the complainant. No partnership existed; each party sold as much as he had the title to; there was no joint sale of any interest in the Volney company, but rather a sale by each of what he considered separate property, a proceeding recognized as proper by the parties interested. I am satisfied that the complainant was not misled or deceived; the Volney company was a wreck, and he had used a large sum of the defendant's money experimenting in his endeavor to produce merchantable powder according to his patents. and seems to have failed, notwithstanding his professions to the defendant. He was an idealist, and not a mechanic. He still retains his interest in the Volney company; no property to which it had title was transferred; not even the patents of 1887, which the complainant had conveyed to that company, have been assigned to the new company. The defendant was needed by the International com-

pany; his name and influence were thought to be valuable, and liberal inducements were offered him. The complainant had two patents which the company thought might be of use and made their offer, which the complainant accepted, and with which he was satisfied, so long as he remained in its employ, and if the letter of April 5th expresses the agreement, as I assume it does, he has received all he bargained for.

There is not the slightest proof that the patents of the complainant had any value, or that the complainant was a practical powder-maker, although he had induced the defendant to think he was, a belief which the defendant seems to have cherished, even after he had invested $25,000 without the production of any merchantable powder. On the day the agreement was made the complainant had for sale his patents, and the defendant the machinery, which had cost him $25,000 and his name and influence in business circles. Each sold what he had, in separate transactions, and the defendant is so strongly corroborated, by the testimony of two witnesses, and the conduct of the complainant after the receipt of the letter, that I must reject the charge of fraud, and am satisfied that when the complainant was told, as stated in the letter, "the consideration to you for the assignment of the patents which you control," he knew that all he was selling was his patents, which he controlled, not those owned by the Volney company, and that he was not being paid for nor parting with any other interest, nor was any interest in the Volney company sold, as that could only be disposed of by an act of the corporation, and the property of that company is still vested in it. This bill of complaint is based upon alleged fraudulent statements and acts of the defendant, which the proofs fail to establish. Without this is sustained, the complainant is not entitled to the aid of this court.

I will advise a decree dismissing the bill of complaint, with costs.